UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA'MARCUS MCDONALD,<br>　　　　　Plaintiff,<br>　　v.<br>COUNTY OF SONOMA, et al.,<br>　　　　　Defendants. | Case No. 20-cv-04183-CRB  (SK)<br><br>**ORDER REGARDING DISCOVERY DISPUTE**<br><br>Regarding Docket No. 78 |

Now before the Court is the joint discovery letter brief filed on February 23, 2023, in which Plaintiff argues for the right to obtain documents from Sonoma County's Independent Office of Law Enforcement Review and Outreach ("IOLERO"). Defendants argue that the attorney-client privilege and attorney work product doctrine protect these documents from disclosure.

**BACKGROUND**

In this action, Plaintiff La'Marcus McDonald, an African-American man, alleges that Defendants the County of Sonoma, Town of Windsor, Sheriff Mark Essick, Deputy Sheriff Travis Perkins, Administrative Sergeant Brent Kidder, and Deputy Gregory Clegg ("Defendants") violated his rights under federal and California state law. (Dkt. No. 15.) This suit is based on events that occurred on July 9, 2019, and began when Sonoma County sheriff deputies, acting as contracted officers for the Town of Windsor Police Department, conducted a welfare check on Plaintiff, who was sleeping alone in a parked car.[1] (*Id*.) Defendant Perkins first approached Plaintiff in his car, and Perkins prodded Plaintiff awake and reached into Plaintiff's car to take a comb out of his hair. (*Id*.) Perkins asked if Plaintiff had consumed alcohol or drugs, and Plaintiff

---

[1] This Order includes facts as Plaintiff alleges in the First Amended Complaint.

said that he had consumed alcohol earlier.  (*Id.*)  Perkins then asked Plaintiff to get out of the car and turn around, and Plaintiff did so.  (*Id.*)  Perkins, without warning, grabbed Plaintiff's arm and employed a "takedown" maneuver to get Plaintiff on the ground.  (*Id.*)  Perkins slammed Plaintiff's head into the ground with this takedown maneuver, knocked Plaintiff unconscious, caused Plaintiff to lose one tooth and break two other teeth, and caused bleeding and lacerations to Plaintiff's face and arm.  (*Id.*)  Perkins never warned Plaintiff that he would use force or that he was arresting Plaintiff.  (*Id.*)

Defendant Clegg witnessed Perkins' unlawful actions but did not intervene, and Defendant Kidder gave his "rubber stamp approval" of the unlawful actions by Perkins.  (*Id.*)  Clegg also "supervised and assisted" the transport of Plaintiff to the hospital with a spit hood over his head, and Plaintiff was also handcuffed to the bed for hours at the hospital and was denied water.  (*Id.*)  The District Attorney did not prosecute Plaintiff, but Plaintiff only learned of that fact a month later when he attended a court hearing.  (*Id.*)

Plaintiff alleges that these actions were part of a "long-time tactic used by and sanctioned by" Defendants Essick, Sonoma County, and Town of Windsor to claim that a person was resisting commands of law enforcement officers to justify an arrest.  (*Id.*)  Plaintiff alleges claims for excessive force and false arrest and claims that Sonoma County and the Town of Windsor have failed to address ongoing constitutional violations over time.  (*Id.*)  Plaintiff points specifically to two recent cases where Defendant Sonoma County's law enforcement officers unlawfully killed individuals as proof that Sonoma County is deliberately indifferent to excessive force in violation of the Constitution and thus that Sonoma County is liable for the actions of its individual officers under *Monell v. New York City Dep't of Soc. Servs*., 436 U.S. 658, 708 (1978).  (Dkt. No. 15.)

As additional evidence that Sonoma County is deliberately indifferent to its law enforcement officers' use of excessive force, Plaintiff also points to audit reports (for fiscal years 206-2017 and 2017-18), a policy recommendation by the IOLERO, and a report issued by the Sonoma County Commission on Human Rights.  (*Id.*)  The IOLERO is an agency that Sonoma County created in 2016 to be a "watchdog" for Sonoma County law enforcement.  (*Id.*)  The ordinance creating IOLERO states that the IOLER exists for the following purposes:

2

> (1) to provide an objective, independent and appropriate review and audit of law enforcement administrative investigations, which include allegations of misconduct, by the Sonoma County Office of the Sheriff-Coroner (hereinafter, "Sheriff-Coroner"); to provide an alternate site for members of the public to file complaints against employees of law enforcement agencies, including the Sheriff's Office;
>
> (2) to propose thoughtful policy recommendations to the Sheriff-Coroner;
>
> (3) to help increase transparency of law enforcement operations, policies and procedures; and
>
> (4) to conduct outreach to and engage the communities of Sonoma County so as to strengthen the relationship between law enforcement in Sonoma County and the communities it serves.

(Dkt. No. 79-5.) The ordinance also states that the Director of the IOLERO "shall be an attorney licensed to practice law in the State of California" and that the "Director shall enter into a special legal services agreement with the County of Sonoma, including its Departments, Agents and Officers, which shall specify the scope, duties and restrictions of the special legal services provided by the Director (hereinafter 'Legal Services Agreement')." (*Id*.) The ordinance further states that the IOLERO was not authorized to "[d]isclose any confidential and/or privileged information to anyone not authorized to receive it." (Id.)

Jerry Threet, the first Director of the IOLERO, entered into a Legal Services Agreement with the County of Sonoma on March 15, 2016. (Dkt. No. 79-8.) The scope of legal services was defined as including but not limited to receiving and reviewing complaints from citizens, reviewing, auditing and analyzing investigations "in coordination with and cooperation with the Sheriff-Coroner," assessing and making recommendations regarding policies, procedures strategies training and practices; advising if investigations are incomplete or deficient; tracking analyzing and advising on legislative actions and "law enforcement audit trends;" and performing "related services as required." (*Id*.)

Defendants claim that the second Director, Karlene Navarro, did not have a written legal services agreement, "due to an oversight, a legal services agreement existed based on the mutual understanding of the partiers and the statute mandate of the prior ordinance." (Dkt. No. 78.)

However, Defendants did not provide any evidence from Navarro or anyone from the County of Sonoma to support this statement.

In yearly reports, the IOLERO provided reports outlining the work of the previous year. (Dkt. No. 79-3.)

## PROCEDURAL BACKGROUND

The District Court found, in denying Defendants' motion to dismiss, that Plaintiff's allegations support the theory of *Monell* liability against Sonoma County and the Town of Windsor. (Dkt. No. 32 at pages 15-18.) The District Court also found that Plaintiff stated a claim for supervisory liability against Essick and Kidder based on the same allegations that support *Monell* liability. (*Id.* at pages 11-14.) In making this determination that Plaintiff alleged facts to support the theories of supervisory liability and *Monell* liability, the District Court specifically referenced, as support for these theories of liability, the previous incidents of force, the IOLERO audit reports and policy recommendation, the Sonoma County Human Rights report, and actual policies of the Sheriff's Department, as cited in the First Amended Complaint. (*Id.* at pages 12-18.)

The parties first brought this dispute over documents from the IOLERO to the Undersigned on May 24, 2022. Specifically, Plaintiffs issued a "First Set of Request for Production of Documents Directed to All Defendants" with 56 categories of documents requested and a "First Set of Interrogatories Directed to All Defendants" with four interrogatories on January 12, 2021. (Dkt. No. 54-1.) The initial dispute centered on the Requests for Production of Documents ("RFP") and Interrogatories that seek information about claims, suits, and incidents that are not related to Plaintiff, information about the oversight of Sonoma County's Sheriff's Department, and disciplinary records that are not directly related to the incident involving Plaintiff. The specific RFPs in dispute were 16-18, 20-35, 39-44, 47-56. The Interrogatories in dispute were Interrogatory Nos. 2 and 3. The Undersigned ruled that RFPs 44, 55 and 56 were not relevant to this action but that other RFPs were relevant. (Dkt. No. 56.) The Undersigned ruled that the documents Plaintiff seeks are relevant to his claims but that the requests for documents and interrogatories were overbroad and overly burdensome. (Dkt. No. 56.) Because Defendants

argued that the information and documents that Plaintiff sought were protected from disclosure by the attorney-client privilege and attorney work product doctrine, the Undersigned deferred ruling on that issue to allow Plaintiff to narrow the scope of the RFPs and interrogatories. (Dkt. No. 56.) Plaintiff has narrowed them and now seeks "police investigation documents, communications, source materials, and audit materials related to excessive force claims and lawsuits used by" IOLERO "in coordination with Sonoma County Sheriff's Office to prepare police audit reports and policy recommendations" during the relevant discovery period.[2]  (Dkt. No. 78.)

## ANALYSIS

Defendants contend that the attorney-client privilege and/or the attorney work product doctrine protect from disclosure the documents from the IOLERO that Plaintiff seeks here.  Under federal law, "[t]he attorney-client privilege shields from disclosure any confidential communications between a client and its attorney." *Fischel v. Equitable Life Assurance*, 191 F.R.D. 606, 607 (N.D. Cal. 2000).  The purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  Under federal common law, the attorney-client privilege protects communications made in confidence from clients to their attorneys seeking legal advice and the attorneys' advice in response. *Matter of Fischel*, 557 F.2d 209, 211 (9th Cir. 1977).  The privilege also extends to papers prepared by an attorney or at an attorney's request for purposes of advising a client, "provided the papers are based on and would tend to reveal the client's confidential communications." *Id.* (citing *United States v. Judson*, 322 F.2d 460 (9th Cir. 1963).  However, the privilege does not extend "beyond the substance of the client's confidential communications to the attorney[.]" *Hickman v. Taylor*, 329 U.S. 495 (1947).

The Supreme Court recognized the attorney work product doctrine in *Hickman v. Taylor*. 329 U.S. 495 (1947).  The Supreme Court described the attorney work product doctrine as follows: "At its core, the work product doctrine shelters the mental processes of the attorney,

---

[2] The Undersigned also ruled that the relevant time period was January 1, 2015 to July 9, 2019.  (Dkt. No. 56.)

providing a privileged area with which he can analyze and prepare his client's case." *United States v. Nobles*, 422 U.S. 225, 238 (1975). The Supreme Court in *Nobles* noted that the attorney work product doctrine is an "intensely practical" doctrine and held that the protection extended beyond work prepared by attorneys to work prepared by other people, such as investigators, working under the direction of attorneys. 422 U.S. at 238. The attorney work product doctrine was codified in Fed. R. Civ. P. 26(b)(3), which provides that, "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative[.]"

Defendants, as the party seeking the protection of the attorney-client privilege and/or attorney work product doctrine, have the burden of showing that the privilege applies. *Weil v. Investment/Indicators, Research & Management,* 647 F.2d 18, 25 (9th Cir. 1981).

Other than the documents described above, Defendants fail to provide any evidence from individuals who worked or work with Sonoma County Sheriff's Office or IOLERO – to state that they believed that the IOLERO provided legal advice to Defendants or that the IOLERO acted as an attorney when creating the documents that Plaintiff seeks. The sole evidence is the legal services agreement between Threet and Sonoma County and the ordinance that created the IOLERO. There is no documentation concerning Navarro – and no evidence from her that she was acting as a lawyer in creating the documents that Defendants contend are protected from disclosure.

It is clear, based on the documents, that Threet, as the Director of the IOLERO, acted as a lawyer in some capacity for some functions, but it is not clear that all of what the Director did was protected by privilege and/or work product. Thus, the County of Sonoma must place the responsive documents that it contends are protected by privilege and/or work product doctrine on a log. Plaintiff is free to challenge the placement of any document on this log.

It is also not clear what Navarro's relationship with the County of Sonoma was, in the absence of any evidence from her or anyone from the County of Sonoma. Given these deficiencies, the Court ORDERS the County of Sonoma to provide any additional evidence to bolster its position, by March 27, 2023. After reviewing that additional information, the Court

1  will rule on the issue of documents involving work product of Navarro or communications with
2  Navarro.
3        To the extent that the County of Sonoma seeks protection of documents involving work
4  product of Threet or communications with Threet, the County of Sonoma must provide a privilege
5  log to Plaintiff by April 4, 2023.
6        **IT IS SO ORDERED**.
7  Dated: March 14, 2023



SALLIE KIM
United States Magistrate Judge